J-A26040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | No. 1281 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000081-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | No. 1282 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000737-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.G.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | | No. 1283 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000082-2021

J-A26040-21

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | No. 1284 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000163-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: H.A.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | No. 1285 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000083-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: H.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | No. 1286 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002042-2018

BEFORE:   BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED DECEMBER 14, 2021**

This termination of parental rights matter pertains to three children:

J.M.B. (hereinafter, J.B.), M.A.G.J.B. (hereinafter, M.B.)  and  H.A.M.W.

- 2 -

(hereinafter, H.W.).[1]  A.B. (Mother) appeals from the six orders entered the same day in the Philadelphia County Court of Common Pleas: three, which terminated her parental rights to each of the children, and three, which changed the permanency goal for each child to "adoption."  On appeal, Mother: (1) presents various claims that she was denied due process and a full and fair evidentiary hearing; and (2) avers both the termination orders and goal change orders were not supported by clear and convincing evidence. We affirm.

## I.  Facts & Procedural History

J.B. was born in 2013, and M.B. was born in 2018.  Their father is G.J. The middle child, H.W. was born in 2017.  His father is M.W., who was incarcerated at the time of the termination and goal change hearings

---

[1] All three children are known by different initials in the captions.  J.M.B. (Docket 1281 EDA 2021) is the same child as J.B. (Docket 1282 EDA 2021). M.A.G.J.B. (Docket 1283 EDA 2021) is M.B. (Docket 1284 EDA 2021). H.A.M.W. (Docket 1285 EDA 2021) is H.W. (Docket 1286 EDA 2021).

The parental rights of H.W.'s father, M.W., were terminated the same day.  His appeals from that order, as well as the goal change order, are currently pending before this same panel at 1217 EDA 2021 and 1218 EDA 2021.

The parental rights of J.B. and M.J.'s father, G.J., were likewise terminated.  His appeals are pending before this Court at 1344 EDA 2021, 1345 EDA 2021, 1346 EDA 2021, and 1347 EDA 2021.

(collectively, "termination hearings").[2]  Both fathers appeared at the hearings by telephone or video.

The trial court issued a thorough, 45-page opinion summarizing the evidence presented, not only at the termination hearings of April 28 and June 1, 2021, but also at the regular permanency hearings, dating back to June of 2019.  Because we write solely for the benefit of the trial court and the parties, who are well familiar with the evidence presented, we need not reproduce the entire factual and procedural history.  Instead, we adopt the summary set forth in the trial court's opinion.  *See* Trial Ct. Op., 7/27/21, at 2-15, 18-22 (testimony of parental capacity evaluator, Dr. William Russell), 22-29 (testimony of Turning Points for Children Caseworker Jasmine Jackson), 29-33 (testimony of Mother).

Nevertheless, for ease of review, we highlight the following.  The children were adjudicated dependent on June 6, 2019, when J.B. was five years old, H.W. was two years old, and M.B. was six months old.  One year and eight months thereafter, the Philadelphia Department of Human Services (DHS) filed the underlying petitions to terminate Mother's parental rights, on February 16, 2021.  The trial court conducted hearings on April 28 and June 1, 2021.  Following the latter hearing, the court entered the underlying six

_____

[2] H.W.'s and M.B.'s birth certificates did not list a father.  Trial Ct. Op., 7/27/21, at 1-2.  However, at the termination hearings, M.W. appeared as H.W.'s father, and G.J. appeared as M.B.'s father (as well as J.B.'s father).

orders, which, respectively, terminated Mother's parental rights and changed the children's permanency goals to adoption.  At this time, J.B. was seven years old, H.W. was four years old, and M.B. was two and a half years old.

Mother filed timely, separate notices of appeal from each of the orders.[3] This Court *sua sponte* consolidated the six appeals.

## II.  Statement of Questions Involved

Mother presents the following issues for our review:

1. Did the trial court violate Mother's Fourteenth Amendment due process rights and abuse its discretion when it failed to conduct a full and fair evidentiary hearing?

2. Were the trial court's orders terminating Mother's parental rights supported by clear and convincing evidence?

3. Were the trial court's orders changing the goals to adoption supported by clear and convincing evidence?

Mother's Brief at 12-13.

## III.  Standard of Review

We note the relevant, general standard of review:

The standard of review which this Court employs in cases of dependency is broad.  However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court.  We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear

---

[3] *See Commonwealth v. Walker*, 185 A.3d 969, 971 (Pa. 2018) ("[W]here a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case.").  *See also In the Int. of K.M.W.*, 238 A.3d 465, 470 (Pa. Super. 2020) (*en banc*) (*Walker* applies to children's fast track cases).

before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re M.P.*, 204 A.3d 976, 985 (Pa. Super. 2019) (citations omitted).

Moreover, we have stated:

It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*Interest of D.P.*, 972 A.2d 1221, 1225 (Pa. Super. 2009) (citation omitted).

## IV. Mother's Due Process Claims

Mother first presents various claims that she was denied a full and fair hearing. We address these *seriatim*. Initially, she avers the court violated her due process rights by "abruptly terminat[ing]" the remote video testimony of G.J. — J.B. and M.B.'s father. Mother's Brief at 39. Mother recounts that G.J., who was incarcerated and testifying by video, had "technical difficulties with his audio connection," and avers the "court did not suggest a short recess to allow [him] to fix the connection." *Id.* Mother contends, without further explanation, that if G.J. were "able to keep testifying, he likely would have provided additional evidence to support Mother's defense. But he never had a change to do so." *Id.* at 40.

By way of background, G.J. appeared by video at the June 1, 2021, termination hearing. G.J. stated he was "in a house," "at work." N.T., 6/1/21, at 71. Technical difficulties with his video connection arose, and the trial court

- 6 -

asked G.J.'s attorney, who was present in court, for G.J.'s telephone number. *See id.* at 68; Trial Ct. Op. at 37. Counsel replied he did not have it and, when questioned by the trial court, could not recall the last time he talked to G.J. *See* N.T., 6/1/21, at 69-70 (counsel first stating he talked to G.J. sometime since the "last hearing," and upon further questioning by the court, stating they "had a conversation after the case was [last] continued," but he could not recall the date). The trial court found G.J. waived his right to participate in the hearing due to his and counsel's failure to "[s]ecure a good line of communication and be in a position to present testimony to the Court just like everyone else on this call."[4] *Id.* at 71.

In response to Mother's claim, that the termination of G.J.'s remote video testimony deprived **her** of her due process rights, the trial court found Mother's argument vague:

> Mother's allegation . . . is a broad assertion that does not state the basis of her claim. This Court cannot speculate what Mother's allegations are where she only stated that [G.J.'s missing] testimony somehow would have supported her case and changed the decision of this Court.

_____

[4] Counsel further stated he had expected G.J. to be in court that day. N.T., 6/1/21, at 72.

On appeal, Mother's characterization, that the trial court "abruptly terminated [G.J.'s] remote testimony," ignores the above circumstances — that the trial court found G.J. and counsel failed to secure a reliable video connection, and that counsel failed even to have a contact telephone number for G.J. *See* Appellant's Brief at 39; N.T., 6/1/21, at 69, 71.

> Mother was never denied the opportunity to participate, testify, and present evidence on her behalf. She participated in the hearings on October 27, 2020, April 28, 2021 and June 1, 2021. Mother and [G.J.] testified on October 27, 2020 and June 1, 2021 and their attorneys were present . . . and presented evidence. Mother was not denied a fair and impartial hearing by this Court.

Trial Ct. Op. at 35 (paragraph break added).

Despite this clear discussion by the trial court, on appeal, Mother continues to omit from her argument any explanation as to what G.J. was prevented from testifying to, nor how it would have supported her position. Indeed, Mother does not address, let alone dispute, the trial court's finding that she has failed to "state the basis of her claim." **See** Trial Ct. Op. at 35. Given the lack of any supporting discussion, we conclude this issue is waived. **See** Pa.R.A.P. 2119(a) (argument shall include such discussion and citation of authorities as are deemed pertinent); **Harris v. Toys "R" Us-Penn, Inc.**, 880 A.2d 1270, 1279 (Pa. Super. 2005) ("We have repeatedly held that failure to develop an argument with citation to, and analysis of, relevant authority waives that issue on review. Pa.R.A.P. 2119(b)[.]").

Next, Mother avers she was deprived of her due process rights because her attorney "failed to introduce relevant and probative evidence of her compliance with DHS goals," and thus deprived her of a full and fair hearing. Mother's Brief at 41, 43. In support, Mother claims, "Although her attorney pre-marked thirteen exhibits showing Mother's compliance with the DHS goals, he did not succeed in getting any of the exhibits introduced into

evidence. Indeed, counsel appeared to be unprepared for objections that the documents were unauthenticated hearsay." *Id.* at 42. These exhibits included "a PHA Waitlist Eligibility Interview Invitation," which would have "show[n] that Mother was working to obtain better housing for her family." *Id.* at 21-22. Mother thus requests this Court reverse and remand for the appointment of new counsel.

Preliminarily, we note:

> The unique nature of parental termination cases has long been recognized by the Supreme Court of Pennsylvania. Thus, [in] *In Re: Adoption of R.I.*, . . . 312 A.2d 601 (Pa. 1973), the Supreme Court held that an indigent parent in a termination of parental rights case has a constitutional right to counsel. The right to counsel in parental termination cases is the right to effective assistance of counsel even though the case is civil in nature. However, this right is more limited than that in criminal cases, as claims of ineffective assistance of counsel must be raised on direct appeal. We then review the record as a whole to determine whether or not the parties received a "fundamentally fair" hearing; a finding that counsel was ineffective is made only if the parent demonstrates that counsel's ineffectiveness was "the cause of the decree of termination." . . .

*In the Interest of J.T.*, 983 A.2d 771, 774-75 (Pa. Super. 2009) (some citations omitted).

Here, the trial court explained that none of Mother's proffered exhibits "were self-identifying [or] self-authenticating, and thus did not comply with Pa.R.E. 902.[ ]" Trial Ct. Op. at 39. *See* Pa.R.E. 902 (listing types of evidence that are self-authenticating, or "requir[ing] no extrinsic evidence of authenticity in order to be admitted[,]" including domestic and foreign public documents and certified copies of public records). By way of example, the

trial court recounted that "Mother testified she was in the process of obtaining housing through [the Philadelphia Housing Authority] and only needed an electricity bill for the screening process." Trial Ct. Op. at 40. The court ruled the PHA "Waitlist Eligibility Interview Invitation" was not admissible because it was hearsay and not clearly established as a business record. *Id.*

We note Mother does not argue that her counsel's conduct **caused** the termination decrees, and we would conclude the record would not support such a finding. *See Interest of J.T.*, 983 A.2d at 775. As Mother points out elsewhere in her brief, she testified "that she had made progress toward her goals and objections . . . since . . . December 2019." Mother's Brief at 20. The trial court considered this testimony. Thus, counsel's alleged ineffectiveness did not result in the complete preclusion of certain evidence. Instead, the evidence would have merely gone to the weight of other evidence presented, by both Mother and DHS.

Critically, Mother's argument does not acknowledge that the trial court extensively considered her testimony — that she was making progress toward her goals — with the evidence by DHS that she was not. For example, with respect to Mother's claim that she attempted to secure housing, the trial court considered Case Manager Jackson's testimony to the following:

> Mother continues to live with her Maternal Grandmother. [T]here are concerns with Maternal Grandmother because she was identified as the alleged perpetrator of H.W.'s burn injury. [T]he home was not structurally inappropriate, however. the barrier with the home is the clutter. There is no space to place beds in the bedrooms. Mother has discussed attending different housing

- 10 -

programs. Mother has been referred several times to the DHS housing unit[,] and she explained to Mother that funds could be obtained for a security deposit and first and last month's rent, however, Mother would have to show that she would be able to pay the rent on her own. Mother has not shown that and was ineligible for the housing program because she was non-compliant with her SCP objectives. Therefore, housing continues to be an outstanding objective for Mother.

Trial Ct. Op. at 26, *citing* N.T. 4/28/21, at 72-74. The trial court also considered DHS' evidence that: Mother admitted she did not want to report her job and income "because she did not want to pay child support for her Children;" Mother's "impulsive, aggressive behavior," which led to, *inter alia*, stay away orders, pertaining to both Case Manager Jackson and the children's resource family's home; denial that the children had special needs or "receive[d] therapeutic services, including for autism;" repeated positive drug screens for opiates; and multiple arrests, charges, and incarceration for unrelated criminal episodes. ***See id.*** at 19, 22. In light of the foregoing, which Mother ignores on appeal, we conclude no relief is due on Mother's ineffectiveness assistance of counsel claim.

In her final due process claim, Mother claims "[t]he trial court's statements and conducting during the hearing violated [her] due process rights." Mother's Brief at 43. After citing relevant case authority, Mother's argument, in sum, is as follows:

In this case, the trial court's hostility toward both parents' counsel and its abrupt termination of the testimony of [G.J.'s] was intemperate and inappropriate, violated the Code of Judicial Conduct, and deprived the fathers and Mother of their due process rights.

*Id.* at 44-45.

Mother does not cite any particular statement or action by the court in support of her contention that the court acted with "hostility." **See** Mother's Brief at 44. Her brief statement above fails to present any developed discussion. Accordingly, this issue is waived. **See** Pa.R.A.P. 2119(a); **Harris**, 880 A.2d at 1279.

### V. Termination of Mother's Parental Rights

Next, Mother asserts the termination decrees were not supported by clear and convincing evidence. She discusses the Subsection 2511(a)(1) grounds for termination solely, and avers the trial court "failed to focus [on] Mother's conduct during the six months immediately preceding the [February 12, 2021,] filing of the petition and instead relied heavily on evidence from 2019 and 2020 — well over a year before the hearing." **See** Mother's Brief at 46-49. **See** 23 Pa.C.S. § 2511(a)(1) ("[t]he parent by conduct continuing for **a period of at least six months immediately preceding the filing of the petition** either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties[ ]"). In support, Mother cites the trial court's consideration of: (1) Dr. Russell's testimony, which "was based on his interview of Mother [on] December 11, 2019[;]" (2) Dr. Russell's March 1, 2020, report; (3) a "BHS Clinic Evaluation Progress Report" and "Urine Drug Testing Reports" for Mother, all dated February of 2020; (4) Mother's March 5, 2020, failure to appear for a CEU assessment;

(5) Mother's March 13, 2020, arrest; and (6) another trial judge's June 8, 2020, order. Mother's Brief at 48 (emphases omitted). We conclude no relief is due.

We note the relevant standard of review:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (citations omitted). We need only agree with the court as to any one subsection of 2511(a), in addition to subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We note Mother presents no challenge pertaining to Subsection 2511(b).

Here, the trial court found grounds for termination of Mother's parental rights under Subsections 2511(a)(1), (2), (5), and (8). As stated above, her argument on appeal refers only to Subsection (1). This Court could affirm on the basis of Mother's lack of any challenge under the other subsections. *See In re B.L.W.*, 843 A.2d at 384. Furthermore, we emphasize that Mother's sole claim is that the trial court erred in considering "old" evidence, rather than evidence pertaining to the six-month period immediately preceding DHS's petitions.

We consider the grounds for termination under Subsection (2):

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Unlike the other subsections of Section 2511(a), Subsection (2) does not set forth a time frame for a court's consideration of the parent's conduct. *See* 23 Pa.C.S. § 2511(a)(1) (referring to the parent's conduct "of at least six months immediately preceding the filing of the petition"), (5) ("The child has been removed from the care of the parent . . . for a period of at least six months . . . ."), (6) (pertaining to "a newborn child"), (8) ("12 months or more have elapsed from the date of removal or placement"). Mother does not present, and we have not discovered, any legal authority that a court is precluded from considering relevant evidence presented in earlier proceedings of the same dependency matter. Accordingly, no relief is due on Mother's challenge to the termination decrees.[5]

_____

[5] As Mother does not present argument pertaining to Subsection 2511(b), we decline to *sua sponte* address it. This Court has observed:

> We acknowledge that panels of this Court have sometimes relied on *In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), to address Section 2511(b), even where the appellant has made no effort to present a challenge regarding that section. In *C.L.G.*,

*(Footnote Continued Next Page)*

## VI.  Goal Change to Adoption

In her final issue, Mother presents a multitude of claims, contending the trial court's goal change orders were not supported by clear and convincing evidence.  For ease of review, we first set forth the relevant legal authority, and then address her arguments *seriatim*.

We first note:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion.  In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record.  We are bound by the trial court's findings of fact that have support in the record.  The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony.  In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence.  When the trial court's findings are supported by competent evidence of

---

this Court . . . initially analyzed the trial court's decision to terminate pursuant to Section 2511(a)(8).  We . . . then proceeded to address Section 2511(b), even though the appellant mother did not present any challenge regarding that section.  This Court did not provide an explanation for its decision to address Section 2511(b).  We merely stated: "Although Mother does not challenge the trial court's analysis of Section 2511(b), we proceed to address this issue nonetheless."  *Id.* at 1010.  We do not read *C.L.G.* to require consideration of Section 2511(b) in every appeal from a decree involuntarily terminating parental rights.  This Court did not hold that consideration of Section 2511(b) was necessary in *C.L.G.*, nor did we cite any authority in support of our decision to address Section 2511(b) *sua sponte*.

*In re M.Z.T.M.W.*, 163 A.3d 462, 466 n.3 (Pa. Super. 2017).

record, we will affirm even if the record could also support an opposite result.

***In re A.K.***, 936 A.2d 528, 532-33 (Pa. Super. 2007) (citation omitted).

With respect to a goal change:

The best interests of the child, and not the interests of the parent, must guide the trial court. ["A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."

***In re A.B.***, 19 A.3d 1084, 1089 (Pa. Super. 2011) (citations omitted).

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

\* \* \*

While this 18-month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

***In re A.K.***, 936 A.2d at 533 (citation omitted).

Section 6351(f) of the Juvenile Act[6] provides:

**(f) Matters to be determined at permanency hearing.—** At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

---

[6] 42 Pa.C.S. §§ 6301-6375.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

(8) The services needed to assist a child who is 14 years of age or older to make the transition to successful adulthood.

(8.1) Whether the child continues to meet the definition of "child" and has requested that the court continue jurisdiction pursuant to section 6302 if the child is between 18 and 21 years of age.

(8.2) That a transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C. § 675(5)(h)).

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\* \* \*

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

42 Pa.C.S. § 6351(f)(1)-(12).

In the instant appeal, Mother avers the trial court failed to consider **all** the statutory factors of 42 Pa.C.S. § 6351(f):

> The trial court's summary conclusions about each child reveal that the court focused on Mother's actions and gave insufficient weight to the best interests of the children. ***See In re B.S.***, 861 A.2d [974, 978 (Pa. Super. 2004)] (holding that trial court erred by focusing on Mother's parenting skills instead of child's best interests). The court does not discuss the bond between the children and their mother or provide facts to support its sweeping conclusion that there is no "real parental relationship" between [J.B.] and his parents.

Mother's Brief at 57. We disagree.

The trial court's analysis was not delineated to specifically address each Section 6351(f) factor in turn. Nevertheless, the court's opinion thoroughly discussed the evidence presented and its findings. We disagree with Mother's claim that the trial court improperly "focused" on her actions, while ignoring the children's best interests and her bond with them. ***See*** Mother's Brief at 57. The court considered Case Manager Jackson's testimony that "Mother was generally consistent with visitation from 2019 until March 2020." Trial Ct. Op. at 27-28. However, with regard to

> the quality of the visits, Ms. Jackson testified Mother was aggressive with J.B. more than she was with the other two Children. She indicated to him that he needed to keep his mouth shut and not tell people things because that's why the Children were in Foster Care. When the visits became virtual there were more issues[.] Mother would use the time to insult the Caregivers and spent little time interacting with the Children. Mother told J.B. that he needed to watch out for his brothers and if anybody touched them, J.B. was to get a knife and stab them. Ms. Jackson stated she discussed with Mother the inappropriateness of her comments and urged her to use the time to bond with her Children. She noted that in April 2020, during virtual visits,

Mother would refer to the Foster Parents in derogatory homophobic terms and indicated to the Children not to let the Foster Parents touch them because the women touch each other. The Children were between the ages of two and seven years old at this time.

[Case Manager Jackson] noted that the visits became in-person in September of 2020, and Mother's visits became supervised one hour once per week at the Agency. The visits were decreased because of the content of the visits and Mother's behavior during the visits. Mother did not have contact with the Children from November 2020 until February 2021 because she was incarcerated. Ms. Jackson testified she reached out to Montgomery County Prison to schedule contact, however, they never followed through were her requests.

Ms. Jackson noted that J.B. stopped attending the visits before Mother was incarcerated. He stated he did not want to visit with Mother and asked if he was forced to see her. J.B. told her his Mother was mean and she made him feel bad about himself and he did not want to visit with her. She also noted that after visits with his Mother. J.B. would exhibit negative behavior, was in a bad mood and very defiant.

[Case Manager Jackson] noted that during the time Mother was incarcerated the Children did not ask for her. [N.T., 4/28/21, at 80-88.]

Ms. Jackson opined that the Children would not suffer irreparable harm if Mother's parental rights were terminated. J.B. does not look to Mother for support and comfort and is not bonded to her. In fact. he specifically stated he feels bad about himself when he is with her.

Regarding H.W., he does not display any attachment to Mother.

Regarding M.J., who was two months old when he came into care, he has not developed a maternal-child bond with Mother. Ms. Jackson testified she has not observed a parental bond between Mother and the Children. She opined these Children do not have a parental bond with Mother and would not suffer irreparable harm if Mother's rights were terminated. [N.T., 4/28/21, at 88-91.]

Trial Ct. Op. at 27-29 (paragraph breaks added). The trial court found Case Manager Jackson's testimony to be credible.

The trial court also found credible

> persuasive testimony from Mike Graves, Esquire, [the child advocate for J.B.. He] testified he spoke to J.B., who is seven and one-half years old, and explained Adoption and his other options. It appeared to him that [J.B.] understood what Adoption was and told him he was fine where he was now. J.B. told him he would like to be Adopted, however, he also stated that he did want to still have visitation with his parents, and his prior caretakers. [N.T., 6/1/21, at 73-74.]

Trial Ct. Op. at 33.

Finally, the trial court weighed the above evidence with Mother's testimony that "she maintains an emotional connection with her Children and shows them affection during visits. She stated the Children are happy to see her and that she can provide a loving and stable home for them now at her Grandmother's house" in Philadelphia. Trial Ct. Op. at 31.

Ultimately, the trial court concluded Mother did not have a bond with any of the Children, and that termination and adoption were in the Children's best interests. In its opinion, the court incorporated the statements it made at the June 1, 2021, hearing:

> The evidence in this case goes back for a substantial period of time beginning with the adjudication of these children, based upon the circumstances then. We'll start with J.B. Here the record is clear, convincing that the parents have done nothing to remedy the issues that brought this child into court. Neither parent is ready, willing and able to care for this child at this time.

There's a substantial credibility issue between what [M]other believes to be her case and what the reality is. And I give little weight to [M]other's testimony. The case worker that testified has an extremely comprehensive grasp on the facts and the history of this case, understands these children.

Mother lives in a kind of fantasy world where she believes that she can keep treating [sic]. Although she has no symptoms she continues to treat for drug and alcohol issue and mental health issues and she says, I don't have any drug issues or mental health issues. But I think the inference to be drawn from that is she does.

And I believe, based on her testimony and some of the irrational beliefs and the deceptive testimony by [M]other, indicates that she has no awareness of what it takes to raise a child. She believes that this child, as well as the other children, can just kind of hang around for a little while and maybe mom will be able to complete all of her objectives and begin to think about parenting a child.

The very fact that she wants to live in a home with a grandparent who was involved and responsible for the original injuries that brought this child into care suggests that she has no concept of reality. And it doesn't appear that she's going to be able to gain that context with any near — in any future period of time.

Trial Ct. Op. at 43, *quoting* N.T., 6/1/21, at 74-76.

These findings, while disadvantageous to Mother's case, disprove her contention that the court did not consider whether any bond existed. *See* Mother's Brief at 57.

Mother next argues the trial court failed to "address any timeframe for when [adoption] might happen" or "whether efforts should be made to place the children in the same home[,]" in contravention of 42 Pa.C.S. § 6351(f)(5) and (10). Mother's Brief at 57.

We note that at the June 1, 2021, hearing, Case Manager Jackson testified that the three children were currently in different foster homes. N.T., 6/1/21, at 79. However, her agency would "continue the search for either one of these foster parents or another foster parent so that the children may be adopted together." *Id.* at 80. Furthermore, the trial court addressed Case Manager Jackson's April 28, 2021, testimony in its opinion:

> Ms. Jackson stated . . . there is a possibility that one of the Foster Parents who is currently fostering M.B., stated [sic] once she stabilized M.B., she would be willing to have the other two Children join their sibling at her house. Ms. Jackson opined that the Children would benefit from positive long-term parental relationships. [N.T., 4/28/21, at 104-105.]

Trial Ct. Op. at 29.

Contrary to Mother's unsupported claim, the trial court did consider whether efforts were made to place the children in the same home. *See* 42 Pa.C.S. § 6351(f)(10); Mother's Brief at 57. Although the trial court did not specify a "likely date by which the placement goal for the [Children] may be achieved," we do not find an abuse of discretion. *See* 42 Pa.C.S. § 6351(f)(5). As of the June 1, 2021, hearing, the children were in foster placement and the Turning Points for Children case manager testified they had been searching for a home where all three children could live together.

Finally, Mother claims the trial court improperly "deferred to the opinions of Dr. Russell (who interviewed Mother in 2019) and [Case Manager] Ms. Jackson, rather than decide based on all the evidence presented at trial." Mother's Brief at 58. She also argues the trial court erred in not considering

the thirteen documents that the court had ruled inadmissible on hearsay grounds. *Id.* at 59, *citing* Pa.R.Juv.Ct.P. 1608(C)(1) ("Any evidence helpful in determining the appropriate course of action, including evidence that was not admissible at the adjudicatory hearing, shall be presented to the court.").

As stated above, the trial court found Case Manager Jackson's and Dr. Russell's testimony to be credible, and specifically found Mother's testimony not credible. The trial court was free to believe all, part, or none of the evidence. *See In re A.K.*, 936 A.2d at 532-33. Mother's arguments go to the weight to be afforded the evidence, and her requested relief would require this Court to supplant the trial court's credibility determinations and findings of fact with our own. This we cannot do. *See id.* Instead, we determine the court's findings are supported by the record, and accordingly, we do not disturb them.

## VII. Conclusion

As Mother has not presented any meritorious claim for relief, we affirm the three termination orders and three goal change orders. The parties are directed to attach a copy of the trial court opinion to this memorandum in the event of further proceedings.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2021



**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS**

| | |
|---|---|
| **IN THE INTEREST OF:** | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-Dependency |
| | : |
| **J.B., a Minor** | : CP-51-DP-0000737-2017 |
| d/o/b: ▬ 2013 | : CP-51-AP-0000081-2021 |
| | : |
| **M.J., a Minor** | : CP-51-DP-0000163-2019 |
| d/o/b: ▬/2018 | : CP-51-AP-0000082-2021 |
| | : |
| **H.W., a Minor** | : CP-51-DP-0002042-2018 |
| d/o/b: ▬/2017 | : CP-51-AP-0000083-2021 |
| | : |
| | : Superior Court Nos.: |
| **Appeal of:** | : 1281 EDA 2021; 1282 EDA 2021 |
| **A.B., Mother** | : 1283 EDA 2021; 1284 EDA 2021 |
| | : 1285 EDA 2021; 1286 EDA 2021 |
| | : CONSOLIDATED[1] |

## OPINION

A.B. ("Mother"), Appeals from the <u>Decrees of Involuntary Termination of Parental Rights</u> and <u>Goal Change to Adoption</u> entered by this Court on June 1, 2021, granting the Petitions to Involuntarily Terminate her Parental Rights to the above referenced Children, filed by the Department of Human Services ("DHS") on February 16, 2021. Mother also appeals this Court's granting the Petitions for Goal Change filed on March 02, 2021. In response to these Orders, Mother, by and through her counsel filed <u>Notices of Appeal with Statement of Errors Complained of on Appeal</u> on June 28, 2021.

---

[1] 07/12/2021, Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeals at Nos. 1281, 1282, 1283, 1284, 1285 and 1286 EDA 2021 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

1

The parental rights of Father, G. J., were involuntarily terminated as to Children J.B and M.J. on June 1, 2020. Father filed appeals at 1344, 1345, 1346, 1347 EDA 2021. Parental rights of Father, M.W., were involuntarily terminated as to Child, H.W. on June 1, 2020 and Father filed appeals at 1217, 1218 EDA 2021. Each of Fathers' appeals addressed in separate opinions.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matter Complained of on Appeal, Mother raises the following issues:

1. The trial court's ruling involuntarily terminating Mother's parental rights was not supported by clear and convincing evidence;
2. The trial court deprived Mother of her due process rights and erred as a matter of law when it abruptly terminated Father's remote video testimony after Father had technical difficulties that impaired his ability to participate and provide testimony that would have supported Mother's case.
3. The trial court erred in holding that each of Mother's twelve exhibits were inadmissible hearsay.

## PROCEDURAL HISTORY:

A.B. (thereafter, "Mother") gave birth to J.B. on ▬▬▬▬, 2013, 2017. G.J. is listed as parent on the birth certificate. (Exhibit "B" *Certification of Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021).

Mother gave birth to H.W. on ▬▬▬ 2017. No father is listed as parent on the birth certificate. (Exhibit "B" *Certification of Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021).

2

Mother gave birth to M.J. on ██████████ 2018. No father is listed as parent on the birth certificate. (Exhibit "B" *Certification of Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021).

On August 8, 2018, the Department of Human Services (DHS) received a General Protective Services (GPS) Report alleging that half-sibling J.T., received trauma therapy for post-traumatic stress disorder (PTSD) that stemmed from severe physical and psychological abuse by his Mother, A.B.; that J.T. had two half-siblings, H.W. and J.B., who were in Mother's care until she went to prison about two weeks prior to the Report; that Mother was physically abusive to J.B. and J.T. when J.T. was residing with Mother prior to June 6, 2017; and that Mother choked J.B. and threw him across the room. The Report further alleged that there was an active Protection from Abuse (PFA) Order against Mother on behalf of the children; that Mother had been arrested for violating the PFA Order by stalking J.T.'s Father and trying to contact him in retaliation for losing custody of J.T.; that Mother had a criminal history of assault in the past; that Mother had a history of severely abusing the Children; and that Mother was diagnosed with substance abuse and depression. This Report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "a").

On October 11, 2018, DHS implemented In-Home Services (IHS) through Community Umbrella Agency (CUA) Turning Points for Children (TP4C). (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "b").

3

On November 16, 2018, DHS received a Child Protective Services (CPS) Report alleging that J.B. was attending Mastery Charter School; that J.B. lifted his pant leg and showed a very large heat burn on his right leg above the knee; that J.B. stated that his dinosaur pajama pants had caught on fire; that J.B. stated that he was playing with a lighter that was used to light a gas stove; and that J.B. burned himself in the home of his Maternal Grandmother, E.B. This Report was indicated. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "c").

DHS' investigation revealed that Mother was not present when the incident occurred; that Mother did not seek medical attention for J.B. and instead, she put peroxide and alcohol on J.B.'s knee. Mother and Maternal Grandmother were hostile and uncooperative with DHS. Mother refused to disclose where her Children received medical treatment, stating only that the office of their primary care physician was located around the Hunting Park area. During the home visit on November 17, 2018, DHS observed that Mother appeared to be several months pregnant. Mother initially denied being pregnant and later stated that she did not know how far along she was into her pregnancy. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "d").

On November 30, 2018, CUA held an initial Single Case Plan (SCP) for J.B. and H.W. The goal identified for the children was "Stabilize Family Functioning". The parental objectives established for Mother were to: 1) cooperate with CUA services, 2) sign all necessary releases and consents for J.B. and H.W., 3) comply with the Behavioral Health Services (BHS) assessment, if referred, and 4) maintain compliance with

4

parenting, anger management, and with conditions of her parole. Mother failed to participate in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "e").

On January 24, 2019, DHS received a CPS Report alleging that Mother was not adequately supervising her Children; that H.W. had a burn on his back that he sustained from hot grease two weeks prior to the Report; that it was unknown how H.W. had sustained the burn; that H.W.'s burn appeared severe; that Mother did not seek medical care for H.W.; and that Mother was not present in the home at the time of the incident. The Report alleged that Mother did not have a good relationship with her Children; that Mother yelled a lot at the Children and hit the Children to control their behavior; and that sibling J.T. resided with his Father, J.T. The Report further alleged that Mother was employed as a Certified Nursing Assistant (CNA); that Mother displayed behaviors which possibly suggested that she suffered from mental health issues; and that Mother used phencyclidine (PCP). This Report was determined to be indicated. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "f").

On January 24, 2019, DHS went to the home of Maternal Grandmother, E.B. DHS met with E.B. and the Children's Maternal Great-Grandfather, S.B., Mother and the Children. DHS informed the family of the reported allegations. E.B. stated that H.W. sustained the burn when she was cooking dinner. E.B. stated that H.W. ran into the kitchen and a mason jar fell and hit the lid of the pot in which she was cooking gravy, and that the hot pot of gravy flipped over and spilled onto H.W. back. E.B. admitted that H.W. was not taken to a hospital emergency room because the family was previously

5

involved with DHS. E.B. stated that she believed that if she took H.W. to a hospital emergency room, DHS would have removed the Children from the family's care. Maternal Grandmother, E.B. and Mother admitted that Mother was not present at the time of the incident. Mother stated that she was at a hospital delivering her newborn baby. Mother stated that she had taken H.W. to a doctor for a sick visit because he had a cold. Mother stated that she believed H.W.'s burn was not severe. S.B. admitted that he was not present at the time of the incident. J.B. stated that he was burned on his knee sometime in November 2018 and that he did not receive immediate medical treatment for his burn. Mother became agitated during the interview, began packing the Children's belongings, and fled the home with the Children. E.B. stated that she did not know where Mother went with the Children. DHS filed a Police Report. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "g").

On January 24, 2019, Mother telephoned DHS in the afternoon from a private telephone number. DHS instructed Mother to take H.W. to the emergency room at St. Christopher's Hospital for Children and told her that if she did not comply, DHS would file a motion with the Court to compel her cooperation. Mother stated that she was not going to take H.W. to St. Christopher's Hospital for Children because she feared that DHS was going to take H.W. away from her. Mother stated that she did not understand why DHS wanted to discuss all the Children when only H.W. had an injury. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "h").

6

On January 24, 2019, Mother telephoned DHS in the evening from a private telephone number. Mother provided DHS with information for a family resource for the Children. DHS tried to contact the family resource by telephone and left a message. DHS did not receive a response from the family resource. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "i").

On January 25, 2019, DHS received a CPS Report alleging that Mother took H.W. for an examination of a wound he had sustained two months prior to the Report; that Mother stated that H.W. had been in the care of his Grandmother when he spilled a pot of boiling water down his back; that Mother stated that no one had witnessed the incident; and that during the examination, H.W. stated that he had burned himself. The report alleged that H.W. was diagnosed with a 2nd degree burn with a surface area wound measuring ten centimeters by seven centimeters on his upper back region; that the wound was healing well; and that Mother had given birth to another Child at the time of the incident. The Report alleged Mother had been incarcerated in the past for unknown reasons. This Report was determined to be indicated. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "j").

On January 28, 2019, Mother telephoned DHS and provided information for her cousin, A.B., to be considered as another family resource for the Children. DHS went to the home of Ms. B. and conducted successful clearances. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "k").

7

On January 28, 2019, DHS received a GPS Report alleging that H.W. has missed six scheduled wellness visits with his primary care physician; that H.W. had only attended one wellness visit, which occurred on May 2, 2017; that Mother was contacted on January 2, 2019 to schedule a wellness visit for H.W., but she refused; that Mother appeared to be neglecting H.W.'s medical care; and that Mother had a history of mental health and substance abuse issues. This Report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "l").

On January 29, 2019, DHS obtained an Order of Protective Custody (OPC) for M.B., H.W. and J.B., and placed them with cousin, A.B. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "m").

A Shelter Care Hearing was held on January 31, 2019, before the Honorable Allan L. Tereshko. The OPC was lifted and the temporary legal custody of the Children transferred to DHS. Placement is with Maternal Cousin, A.B. Mother is to have supervised visits at the Agency. DHS to follow up to ensure Child is up to date with medical and any follow up appointments. DHS to follow up and explore Father, G.J. as possible resource. Children are safe as of 1/29/2019. (Shelter Care Orders, 1/31/2019).

In 2015, H.W.'s Father, M.W., pled guilty to the unlawful possession of a controlled substance. In 2017, Father pled guilty to endangering the welfare of Children, aggravated assault, simple assault, and recklessly endangering another person. On December 19, 2017, Father was sentenced to 3 to 6 years' confinement. Father remains incarcerated at State Correctional Institution (SCI)-Somerset. (Exhibit "A" Statement of

Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "p").

On February 7, 2019, the Children's Adjudicatory Hearings were continued by the Honorable Allan L. Tereshko. Mother referred to CEU for a forthwith screen, and one random prior to the next court date. Family finding is to be explored. (Continuance Order, 2/07/2019).

On February 7, 2019, Mother underwent a forthwith screen with the CEU, testing positive for Opiates. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "r").

On March 7, 2019 the Children's Adjudicatory Hearings were continued by the Honorable Allan L. Tereshko. Children are in Foster Home through Turning Points for Children and are safe as of 3/01/2019. (Continuance Order, 3/07/2019).

On April 4, 2019, the Children's Adjudication deferred by the Honorable Allan L. Tereshko. Children are in Foster Care through Turning Points for Children and are safe as of 4/03/2019. Mother's visits are suspended pending outcome of the Child Abuse Hearing. Father, M.W., attended the hearing. (Continuance Order, 4/04/2019).

An Adjudicatory Hearing was held for the three Children on June 6, 2019, before the Honorable Allan L. Tereshko. The Children were found to be Dependent Children and legal and physical custody transferred to DHS. Placement in Kinship Care. Parents to sign necessary consents. SCP meeting to be held within 20 days. Mother referred for a Parent Capacity Evaluation (PCE), and to participate in ARC. Mother to provide proof of employment and referred to BHS for consultations and/or evaluations. Mother to have supervised visits with the Children at the Agency twice per week. Mother to CEU for 2

random screens prior to next court date. Child Abuse is unfounded as to J.B. (Orders of Adjudication and Disposition, 6/06/2019).

On July 23, 2019, CUA held a revised SCP for the Children. The goal identified for them was "Return to Parent, Guardian, Custodian." The parental objectives established for Mother were to: 1) comply with CUA services and court orders; 2) have a BHS evaluation, 3) have a PCE; 4) attend ARC services; 5) maintain contact with the Children; 6) comply with drug and alcohol screens. Mother participated by telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "u").

A Permanency Review Hearing was held on July 24, 2019, before the Honorable Allan L. Tereshko. Legal custody remained with DHS and placement continued in Foster Care through Turning Points. Mother referred to Anger Management and visits remain status quo. DHS to engage in family finding until further order of court. Children are safe as of 7/03/2019. (Permanency Review Orders, 7/24/2019).

A Permanency Review Hearing was held on October 10, 2019, before the Honorable Allan L. Tereshko. Legal custody remained with DHS and placement continued in Foster Care through Turning Points. Mother's visits with Children to be supervised twice weekly at the Agency. Mother referred to ARC for Anger Management. Mother to comply with PCE when scheduled. Mother referred to CEU for forthwith screen, dual diagnosis and three randoms prior to next court date. DHS to explore family resources. Children are safe as of 10/08/2019. (Permanency Review Orders, 10/03/2019).

10

On October 19, 2019, Mother underwent a Comprehensive Biopsychosocial Evaluation (CBE) through Cognitive Behavioral Services. Mother admitted to using marijuana and denied exhibiting any anger/rage. Mother recommended to complete Anger Management as Court ordered and for her to receive outpatient mental health treatment. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "x").

On January 16, 2020, DHS held a revised SCP meeting for the Children. The goal identified for them was "Return to Parent, Guardian, Custodian." The parental objectives established for Mother were to: 1) comply with CUA services and court orders; 2) have a BHS evaluation, 3) have a PCE; 4) attend ARC services; 5) maintain contact with the Children; 6) comply with drug and alcohol screens. Mother did not participate in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "y").

On January 30, 2020, Mother underwent a screen with the CEU, testing positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "z").

Status Review Hearings held on February 6, 2020, before the Honorable Allan L. Tereshko. Legal custody remained with DHS and placement continued in Foster Care through Turning Points. Mother referred to CEU for forthwith screen, dual diagnosis and three randoms prior to next court date. Cases continued due to CUA worker's failure to appear. (Status Review Orders, 2/06/2020).

On February 6, 2020, Mother underwent a forthwith screen with the CEU, testing

positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "bb").

On February 26, 2020, Mother underwent a screen with the CEU, testing positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "cc").

On March 1, 2020, Dr. William Russell of Forensic Mental Health Services, LLC, issued a Report of Forensic Evaluation, PCE, as to Mother who was interviewed by Dr. Russell on December 11, 2019. Regarding employment, Mother reported to be unemployed and receiving food stamps and medical assistance. When asked why she does not work, Mother reported "I do not have to go to work. I am not going to work." Mother reported that she receives money from her Grandmother and the Children's Fathers when she asks. Mother reported to not recall the last time she was employed. Mother reported she remains living in her grandparents' home where the Children were initially removed. Mother admits that she continues to be in a relationship with Father, G.J. Mother denied any illicit drug use, contrary to her October 19, 2019 admission to marijuana use along with her January 2020 and February 2020 positive screenings for PCP use. Mother stated she was hit "by a MACK truck" in July 2019 and currently goes to Spinal Care for physical therapy 2 to 3 times weekly for her injuries. Mother admitted to lying about being unemployed, stating that she is "currently employed at Green Meadows, but I did not want to tell anyone because I do not want to have to pay child support towards my Children." Mother admitted that she is currently on probation because of her violating a PFA issued against her regarding her Child J.T.'s Father, J.T. Mother expressed that she did not want J.B., H.W. and M.J. to be around "dykes" in their

12

current resource home. Mother denied that any of her Children have special needs and was unsure where J.B. attended school. Mother denied there were any difficulties in being a parent. Dr. Russell observed that Mother had poor memory, often forgetting important events and dates in her life. Her insight is limited, which impacts her judgment. Further, Dr. Russell observed Mother has issues with emotional and behavioral control. Dr. Russell determined that Mother is not able to provide safety for her Children at this time. It was recommended for Mother to obtain and maintain stable employment as well as appropriate housing, comply with all requests and inspections by CUA, as well as participate in individual counseling to review her history of allegations regarding physical abuse made about her and explore why the PFA was ordered. Visitation was recommended to remain supervised. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "dd"). (DHS Exhibit #12, Report of Forensic Evaluation, 3/01/2020).

On March 5, 2020, Mother failed to appear for her scheduled CEU assessment. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "ee").

On March 13, 2020, Mother was arrested and charged with burglary-overnight accommodations; person present, bodily injury crime; criminal trespass-break into structure; theft by unlawful taking of movable property; receiving stolen property; resisting arrest; and criminal mischief. Mother posted bail on March 13, 2020. The hearing was scheduled for December 2, 2020. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "ff").

On June 8, 2020, Supervising Judge, Honorable Walter J. Olszewski, ordered that Mother stay away from TP4C Case Manager, Jasmine Jackson's, personal residence and family as well as refrain from making threatening comments toward TP4C staff or about their families. Further, the Court ordered Mother to stay away from the resource family's home and refrain from making disparaging comments directly related to the resource parents during visitation with her Children. (Administrative Orders, 6/08/2020).

On June 24, 2020, Mother appeared for the Court ordered assessment with the CEU and was verbally aggressive towards the CEU evaluator and supervisor, refusing to answer the assessment questions. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "hh").

On September 30, 2020, Mother was again arrested and charged with terroristic threats with intent to terrorize another; conspiracy; simple assault; and recklessly endangering another person. Mother out on bail. The hearing was scheduled for December 2, 2020. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 2/16/2021, ¶ "ii").

A Permanency Review Hearing was held for the three Children on October 27, 2020, before the Honorable Allan L. Tereshko. Legal custody remained with DHS and placement continued in Foster Care through Turning Points. Mother's visitation decreased to supervised once a week at the Agency, and Mother missed 2 visits since last court date. Mother attends COHMAR for mental health and is currently unemployed. Mother continues residing with her Maternal Grandmother. CUA to do a home evaluation at Mother's home. Mother is not to go to the Children's school or to the home of the Foster Parents. Mother referred to the CEU for a screen, monitoring, and three

14

random screens prior to the next court date. Mother to provide CUA with proof of employment. Mother to BHS for monitoring. (Permanency Review Orders, 10/27/2020).

A Status Review Hearing was held for the Children on February 17, 2021, before the Honorable Allan L. Tereshko. Case continued as Mother recently hired private counsel. All prior orders stand. Mother to CEU forthwith for drug screen, dual diagnosis assessment and monitoring. Mother to have three randoms before next court date. Motion for Temporary Placement with next of Kin is denied. CUA to submit safety affidavit within 7 days. (Status Review Orders, 2/17/2021).

Upon consideration of DHS' Motion to Modify Dependent Child's Placement, this Court GRANTED Petitioner's Motion. It was hereby Ordered and Decreed that the Children shall not return to the home of Lauren Lopez, and J.B. shall remain in the General Foster Care Home through Delta Services. M.J. and H.W. shall remain in the General Foster Care Home through Progressive Life. (Orders, 4/15/2021).

A Permanency Review Hearing was held for the Children on April 28, 2021, before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement remains in Foster Care. Children remain as committed and placed. Any changes to the exhibits and/or witness list to be exchanged 10 days prior to next court hearing date. (Permanency Review Orders, 4/28/2021).


**STANDARD OF REVIEW AND LEGAL ANALYSIS**

When reviewing an appeal from a decree terminating parental rights, an appellate court is limited to determining whether the decision of the trial court is supported by

15

competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197 Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

**The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511 (a)(1), (2), (5) (8) and 2511 (b)** [2]

---

[2] **23 Pa.C.S.A. §2511 (a) General Rule.**—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. (5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time,

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of

---

the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. (8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

**23 Pa.C.S.A. §2511 (b). Other Considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Mother alleges this Court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under 23 Pa.C.S.A. §§2511 (a) (1), (2), (5), (8). This Court disagrees.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

This Court heard expert testimony from William Russell, Ph.D., licensed Psychologist at Forensic Mental Health Services, LL., who conducted a Parental Capacity Evaluation for Mother. He interviewed her on December 11, 2019, and produced a Report dated 3/01/2020. Dr. Russell noted that in conducting an Evaluation, he looks for an individual's ability to provide a safe environment as a primary caretaker. He reviews

18

the individual's history, functioning, mental health, social demographic information, employment and housing. These provide information that is relevant to coming to a conclusion as to whether an individual is able to provide safety and day to day functioning. He noted the evaluation and clinical interview of Mother also included psychological testing. (N.T., 4/28/2021, p.25 at 14-25, p.26-27 at 1-25, p.28 at 1-6).

Dr. Russell testified that he made recommendations to address Mother's weaknesses and other issues. One recommendation was that Mother obtain and maintain stable employment. This was based on her ability to function on a day to day basis on her own and take care of herself. Mother had no income and no source of support. Mother told him she did not need to work, and that she could ask for money from the Fathers of her babies. Mother reported no history of employment in the interview and reported no desire to get employment. Mother stated to him, "I do not have to work. I am not going to work." Then Mother contradicted herself by telling him she did have a job and did have income, but that she did not report it because she did not want anyone to know because she did not want to pay child support for her Children. Therefore, Dr. Russell noted that he had a concern about Mother being able to be supportive of her Children. Mother never indicated an inability to work other than volition. (N.T., 4/28/2021, p.28-29 at 1-25, p.30 at 1-22).

Dr. Russell testified another recommendation for Mother was to obtain and maintain appropriate housing. This recommendation is interrelated with income. Mother stated she resided with her Grandparents. When he questioned her about finding her own housing, Mother commented that if she wanted housing, she could easily obtain it. Mother did not indicate whether she was looking to obtain housing at the time of her

19

interview. Dr. Russell opined that housing is a basic component of providing a stable, safe, consistent physical environment for a child to mature, develop and grow. (N.T., 4/28/2021, p.31-32 at 1-25).

Dr. Russell testified another recommendation for Mother was to comply with all requests and inspections by the CUA Worker. That was based on Mother's impulsive, aggressive behavior. He noted it was important for her to work with them and comply with DHS and the CUA. He noted that Mother's overall presentation was aggressive, glib and very much that she did not need assistance. Mother did not understand why people were involved because she did not hurt her Children and they were fine. In Mother's view all people involved were causing problems, including the Fathers of the Children. A number of times Mother made specific threats regarding the Fathers. Dr. Russell referred to page 8 of his report and noted that it reflects Mother's unwillingness to look at CUA as a helping agency to get her Children back. Her perception and presentation is that as Mother stated, "I think the system and DHS is full of shit." Mother externalizes blame for the situation and the issues involved. It was always DHS, or CUA or the Fathers who were responsible for the situation. Mother did not acknowledge her role at all throughout the interview. He noted it would be important for Mother to develop some insight into her role and responsibility, especially regarding the physical abuse of the Children. It would be important for Mother to have some insight into how her impulsive, aggressive behavior puts her at odds in different situations and is very detrimental to the welfare of her Children. (N.T., 4/28/2021, p.33-35 at 1-25, p.36 at 1).

Regarding visitation, Dr. Russell recommended for visitation to remain supervised because of the history and his concerns regarding Mother's impulsiveness and

20

aggression during the Evaluation. He noted it was Mother's overall presentation, she was not physically aggressive, but she was verbally aggressive and voiced threats against the Fathers of her Children. The overall glibness of her responses, and her lack of engagement during the interview. (N.T., 4/28/2021, p.37 at 24-25, p.38 at 1-21).

Dr. Russell testified he did not include a recommendation for drug and alcohol treatment for Mother because at the time he conducted the evaluation he did not see any significant reports of alcohol or substance abuse. Mother denied the use of alcohol or any illicit substance. He noted however, if he had later been told that Mother tested positive for opiates in 2019 and PCP four times in January and February of 2020, he would certainly recommend the need for drug and alcohol treatment. He noted that Mother's continuous use of illicit drugs is saying that her feelings, her needs and her use of PCP overtakes the needs of her Children. (N.T., 4/28/2021, p.38 at 22-25, p.39 at 1-21).

Dr. Russell testified that Mother's results in the MMPI-2-RF testing reflect an individual who continuously has difficulty in getting along with others and suspiciousness and paranoid perception of others certainly complicates her ability to interact with people. Mother indicated she did not want her Children in the Foster Home because, "My kids being around two dykes." (N.T., 4/28/2021, p.39 at 22-25, p.40 at 1-15).

Dr. Russell noted that Mother was unsure where her Children attended school and denied any of them having special needs. He noted he included this in his Report because a parent whose children are in care would be expected to want to know what is going on, what they are doing, where they are going to school, and how they are doing with their mental health. Mother however denied that her Children receive therapeutic

21

services, including for autism and stated, "they are fine and have no special needs." Based on his PCE, Dr. Russell opined that Mother was not able to provide safety for the Children at the time of the evaluation and interview. (N.T., 4/28/2021, p.42 at 1-25, p.43 at 1-24) (Report of Forensic Evaluation, 3/01/2020, p. 9-10).

This Court heard persuasive, clear and convincing evidence from Jasmine Jackson, Case Manager, Turning Points, CUA5, who testified this Child came to DHS care subsequent to a General Protective Services (GPS) Report dated in August 2018, with allegations of inappropriate discipline, and conduct by the parents that placed the Children at risk. Mother was cooperative with visits but uncooperative with the interviews and the investigation. Ms. Jackson was working with the family for in-home services, the purpose was for us to monitor the safety of the Children and to ensure their basic needs were being met. (N.T., 4/28/2021, p.52 at 24-25, p.53 at 1-25, p.54 at 1-12).

Ms. Jackson testified when she was assigned to this case, Mother had two Children, J.B. and H.W, and was pregnant with M.B. Mother and the Children were living with Maternal Grandmother. In November 2018, there was a CPS Report for J.B. and the allegations were repeated, prolonged or egregious failure to supervise. The circumstances were that he had a burn on his knee, and he had not received any medical treatment. Mother was instructed to take the Child to the doctor, but Mother refused and stated she treated the burn herself. Mother finally sought medical treatment for J.B. on 1/07/2019. On 1/29/2019 a CPS Report was filed for H.W. alleging there were reported, prolonged or egregious failure to supervise and failure to provide medical treatment. The circumstances were that H.W. had a burn across his back and he did not receive medical treatment. Mother claimed she did not know about the burn to H.W.'s back. DHS went

22

to the home and told Mother they intended to file an OPC, and that prompted Mother to put the Children's jackets on and they left Maternal Grandmother's home. Mother made her whereabouts known on 1/29/2019, and she agreed to take the Children to her cousin's home and the OPC was filed by DHS. There was a Report dated 1/28/2019, noting that H.W. had not seen his primary care doctor since May of 2017, and that Mother had been contacted by the doctor to schedule an appointment, however Mother refused. Children were living with Mother at that time. Father was not involved with the Children's care and DHS did not have any knowledge of contact information for him. Ms. Jackson noted that while the Agency was providing in-home services for the family from October 2018, until the filing of the OPC in January of 2019, she had never seen Father in the home. (N.T., 4/28/2021, p.54 at 13-25, p.55 at 1-25, p.56 at 1-17, p.57-58 at 1-25, p.59 at 1-5).

Ms. Jackson testified she established SCP objectives for Mother, and she was aware because she discussed the objectives with her. Mother's initial objectives were parenting, anger management, to cooperate with CUA and to sign immediate release of consents. Additional objectives were added later: to follow the recommendations of an evaluation at BHS, CEU drug screens and drug and alcohol assessment, a parenting capacity evaluation, ARC services, as well as, employment verification and visitation. (N.T., 4/28/2021, p.60 at 1-25, p.61 at 1-11, p.62 at 7-20).

Regarding Anger Management, Ms. Jackson testified Mother was already engaged in Anger Management as a condition of her criminal case. DHS investigated Mother's criminal docket to confirm the condition and Mother confirmed. Mother completed a course in February 2019 and again completed an Anger Management course through ARC in December 2019. However, Ms. Jackson testified Mother has ongoing

anger issues. She opined Mother did not implement techniques she presumably learned in these programs to control her anger. Mother had made threats to go take the Children from their Foster Home. She stated she knew where they were and if she was not reunified with them, she would go and take the Children herself. Mother threatened her personally and told her if she continued to lie about her, she knew where she lived, and she would need to watch out for her own children. As a result of this threat, a Stay Away Order was issued by the Court on June 8, 2020. Mother was to "Stay Away from the Turning Points for Children's case manager, Ms. Jackson's personal residence and family and refrain from making any threatening comments towards Turning Points for Children's staff or about their families. Additionally, Mother was to Stay Away from the resource family's home, where the Children and siblings were currently placed, and refrain from making disparaging comments directly related to the resource parents during visitation with the Children." Ms. Jackson testified at this time Anger Management continues to be an outstanding objective for Mother. (N.T., 4/28/2021, p.62 at 21-25, pp. 63-64 at 1-25; p.65 at 1-17) (Order, 6/08/2020).

Regarding the objective of BHS and the Mental Health Evaluation, Mother completed an evaluation in October 2019. The recommendation of the evaluation was that Mother attend and complete outpatient therapy. Mother stated she was told after the evaluation that she did not need therapy and disputed the fact that the recommendation was given. Mother did not provide her any documentation regarding mental health treatment, until August of 2020 when Mother informed her that she had engaged at COMHAR. Ms. Jackson did confirm that Mother became engaged in August 2020. Mother was attending the program at COMHAR until November 2020 when she was

24

incarcerated. Mother telephoned her in February 2021 and stated she was no longer incarcerated. Mother presented progress notes from treatment from a program called Caring Together where she began attending on February 23, 2021. Mother's objective of mental health continues to be an outstanding objective. (N.T., 4/28/2021, p.65 at 18-25, pp.66-69 at 1-25, p.70 at 1-2).

Ms. Jackson testified Mother completed the Parenting Capacity Evaluation with Dr. Russell and the recommendations made at the PCE were consistent with the SCP objectives. (N.T. 4/28/2021, p.70 at 3-11).

Regarding employment, Ms. Jackson testified Mother first told her that she did not need to work because her family provided support. In June of 2019, Mother did provide her with a work schedule noting that she was working as a home health aide. Shortly thereafter, Mother stated she was not working anymore. Then Mother stated she was incapable of working due to an injury. Mother was asked to provide medical documentation of her injury, which she did but she did not provide documentation that the injury prevented her from working. Mother stated that she would not work because then she would be required to pay child support for her Children, and she did not want to do that. In November of 2020, Mother sent an email with an unemployment statement that showed she received unemployment benefits. The statement showed Mother was eligible for benefits since June 2020. Ms. Jackson testified she does not know whether she receives unemployment benefits at the present time. Mother stated she did not have a financial plan to care for her Children, however, she would apply for disability income. (N.T., 4/28/2021, p.70 at 12-25, p.71 at 1-25, p.72 at 1-18).

25

Regarding housing, Ms. Jackson testified Mother continues to live with her Maternal Grandmother. She noted there are concerns with Maternal Grandmother because she was identified as the alleged perpetrator of H.W.'s burn injury. She also noted that the home was not structurally inappropriate, however, the barrier with the home is the clutter. There is no space to place beds in the bedrooms. Mother has discussed attending different housing programs. Mother has been referred several times to the DHS housing unit, and she explained to Mother that funds could be obtained for a security deposit and first and last month's rent, however, Mother would have to show that she would be able to pay the rent on her own. Mother has not shown that and was ineligible for the housing program because she was non-compliant with her SCP objectives. Therefore, housing continues to be an outstanding objective for Mother. (N.T., 4/28/2021, p.72 at 19-25, p.73 at 1-25, p.74 at 1).

Regarding the drug and alcohol treatment objective, Ms. Jackson testified Mother was referred for drug testing because DHS' investigation had concerns about Mother's possible drug use. Therefore, drug testing was ordered as early as January 29, 2019, and Mother initially tested positive for opiates. Since then testing has been ordered continuously at every court listing. Mother failed to attend a CEU assessment until September 2020, over a year and a half into the case. Mother's appointment for assessment on 6/24/2020 was virtual and the assessor indicated that Mother was non-cooperative, and very hostile to questions during assessment. The assessment was never completed, and no recommendations were given. Mother received drug screenings on 1/30/2020, where she tested positive for PCP. Another screen on 2/05/2020, was positive for PCP. After the court hearing on 2/06/2020, Mother was ordered forthwith for drug

screen which was positive for PCP. On 2/26/2020, Mother tested positive for PCP. Ms. Jackson noted that random drug screening shut down in March 2020 due to the Pandemic. She noted that Mother engaged in IOP drug and alcohol treatment at the Wedge at the end of July 2020. Mother provided drug screens from the Wedge that indicated Mother was positive for opiates. Mother did not provide documentation of completion because she was incarcerated in November 2020. Mother never provided any medical documentation that she was prescribed opiates from a physician. Ms. Jackson testified she observed Mother under the influence at a visit with the Children on 3/10/2020. Mother arrived late for the visit, shuffling her feet, slurring her words and her eyes were half closed. Mother asked if she could hug M.J. and she picked him up, hugged him to her chest and would not let him go. She rocked back and forth, crying and stated that DHS was stealing her Children. Security had to be called to explain to Mother that police would be called if she did not release the Child. Ms. Jackson noted that all three Children were present during that visit and observed Mother. Mother did not provide any documentation of successfully attending and completing a drug and alcohol treatment program and Mother's SCP objective for drug treatment remains an outstanding objective. (N.T., 4/28/2021, p.74 at 2-25, pp.75-79 at 1-25, p.80 at 1-16).

Regarding visitation, Ms. Jackson testified Mother was originally ordered supervised visitation twice per week for one hour when the case began. Mother's visitation was then suspended between April 2019 and June 2019 because of Mother's behavior towards staff members. Mother's visits were reinstated in June 2019 as supervised for one house twice per week. This scheduled remained until March of 2020 when COVID closures began. Ms. Jackson testified Mother was generally consistent

27

with visitation from 2019 until March 2020. Regarding the quality of the visits, Ms. Jackson testified Mother was aggressive with J.B. more than she was with the other two Children. She indicated to him that he needed to keep his mouth shut and not tell people things because that's why the Children were in Foster Care. When the visits became virtual there were more issues that arose. During those visits Mother would use the time to insult the Caregivers and spent little time interacting with the Children. Mother told J.B. that he needed to watch out for his brothers and if anybody touched them, J.B. was to get a knife and stab them. Ms. Jackson stated she discussed with Mother the inappropriateness of her comments and urged her to use the time to bond with her Children. She noted that in April 2020, during virtual visits, Mother would refer to the Foster Parents in derogatory homophobic terms and indicated to the Children not to let the Foster Parents touch them because the women touch each other. The Children were between the ages of two and seven years old at this time. She noted that the visits became in-person in September of 2020, and Mother's visits became supervised one hour once per week at the Agency. The visits were decreased because of the content of the visits and Mother's behavior during the visits. Mother did not have contact with the Children from November 2020 until February 2021 because she was incarcerated. Ms. Jackson testified she reached out to Montgomery County Prison to schedule contact, however, they never followed through were her requests. Ms. Jackson noted that J.B. stopped attending the visits before Mother was incarcerated. He stated he did not want to visit with Mother and asked if he was forced to see her. J.B. told her his Mother was mean and she made him feel bad about himself and he did not want to visit with her. She also noted that after visits with his Mother, J.B. would exhibit negative behavior, was in a

bad mood and very defiant. She noted that during the time Mother was incarcerated the Children did not ask for her. (N.T., 4/28/2021, p.80 at 21-25, pp.81-87 at 1-25; p 88 at 1-17).

Ms. Jackson opined that the Children would not suffer irreparable harm if Mother's parental rights were terminated. J.B. does not look to Mother for support and comfort and is not bonded to her. In fact, he specifically stated he feels bad about himself when he is with her. Regarding H.W., he does not display any attachment to Mother. Regarding M.J., who was two months old when he came into care, he has not developed a maternal-child bond with Mother. Ms. Jackson testified she has not observed a parental bond between Mother and the Children. She opined these Children do not have a parental bond with Mother and would not suffer irreparable harm if Mother's rights were terminated. (N.T., 4/28/2021, p.88 at 18-25, pp.89-90 at 1-25, p.91 at 1-12).

Ms. Jackson stated the three Children are currently in separate homes, however, there is a possibility that one of the Foster Parents who is currently fostering M.B., stated once she stabilized M.B., she would be willing to have the other two Children join their sibling at her house. Ms. Jackson opined that the Children would benefit from positive long-term parental relationships. (N.T., 4/28/2021, p.104 at 12-25, p.105 at 1-25).

Mother was the next witness to testify. She gave her address as 3211 North Revere Street, Philadelphia, PA 19140, and stated she lives with her Grandparents. She stated she was in the process of obtaining housing through PHA and only needs an electricity bill for the screening process. (N.T., 6/01/2021, p.14 at 20-25, p.15 at 1-14).

Mother denied choking her son, J.B., and denied throwing him across the room in the presence of her other son, J.T. Mother stated that J.B. burned himself at her Mother's home and that she was not present when that occurred. She stated she treated his burns herself because she does nursing and gave him first aid by washing the burn with soap and water, applying peroxide and wrapping it. Regarding H.W.'s burn, Mother stated she was giving birth to her infant when this occurred, and she was not present at Grandmother's home. Mother stated she sought medical treatment for him when she became aware of the injury. Mother stated her Children were removed from her care because of the burn incidents and no other reasons. (N.T., 6/01/2021, p.18 at 2-25, p.19 at 1-24).

Mother testified she is now with the Caring Together program, and the Looking Forward program that are in Germantown. She stated she has been with the Caring Together drug and alcohol program since February 2021 and prior to that Mother stated she was in a program at The Wedge receiving dual services, mental health and drug and alcohol treatment. Mother stated she complied with all the programs. Mother stated she has primary care at Greater Philadelphia Health Action. (N.T., 6/01/2021, p.20 at 19-25, pp.21-22 at 1-25, p.23 at 1-16).

Mother testified she attended a mental health program at COHMAR but did not know if it was dual services or not. Mother stated she completed the parenting capacity evaluation. Mother then testified she was receiving mental health services at Caring Together. She stated she meets with a peer specialist named Karen once a week and also has group sessions like parenting class, grief and loss. (N.T., 6/01/2021, p.26 at 14-25, p.27 at 1-23, p.28 at 1-24, p.29 at 1-25, p.30 at 1-7).

Mother testified she attends ARC for housing and stated she completed the financial education program, the budgeting workshop, and anger management. She noted that her last drug screen was last Monday. (N.T., 6/01/2021, p.30 at 16-25, p.31 at 1-15).

Regarding visitation, Mother testified she has maintained contact with her Children for the past two years and visits them once a week for one hour. She also participated in virtual visits. She noted that she missed visits when she was incarcerated. Mother testified she continues drug screens and her most recent drug test was positive for opioids. Mother stated she is under doctor's care and has been prescribed drugs by Dr. Gregory Nelson since 2020 when she was in a motor vehicle accident and injured her foot. Mother stated she has not tested positive for any other substances recently. (N.T., 6/01/2021, p.33 at 8-25, p.36 at 8-25, p.37 at 1).

Mother testified she maintains an emotional connection with her Children and shows them affection during visits. She stated the Children are happy to see her and that she can provide a loving and stable home for them now at her Grandmother's house at 331 North Revere Street, Philadelphia, PA 19140. Mother stated she has family support and support from the Children's Father. Mother stated she just needs to get bedding and to clear out the clutter in the four-bedroom house to give the Children adequate space. Mother stated she has completed all of her objectives. (N.T., 6/01/2021, p.37 at 15-25, p.38 at 1-25, p.39 at 1-23, p.40 at 1-4).

On cross-examination by Megan Fitzpatrick, Esquire, attorney for DHS, Mother testified she was unaware that the last drug test result on record was spring of 2020 when she tested positive for PCP. Mother stated her drug treatment is ongoing and she has not completed any drug and alcohol treatment program yet. Mother stated she went to

31

various programs because of miscommunications and she bounced around because she needed to find a program that fit her. Regarding Anger Management, Mother stated she is working with a peer specialist every week for her anger issues. Regarding her criminal case, Mother stated it was not any issue because she has finished her probation and that would not conflict with her reuniting with her Children. (N.T., 6/01/2021, p.40 at 13-25, pp.41-43 at 1-25, p.44 at 1-21).

Further on cross-examination, Mother stated she understood that the only reason her Children were removed from her care was that they had burn injuries and not the fact that she was uncooperative with DHS' investigation, had allegations of PCP use, and was non-compliant with mental health treatment. Mother stated she treated H.W., for his burns at home and he did not require medical care because her Grandmother is a retired LPN and she had knowledge of how to treat the burns. Mother stated her Children went to see routine medical treatment. Mother further stated that she has provided documentation of her mental health treatment to the CUA Worker and her attorney. Mother also testified she did have a prescription for opiates since she had various injuries and was injured again in 2019. Mother stated she gave a copy of the prescription to the CUA Worker and her attorney. (N.T., 6/01/2021, p.45 at 9-25, pp.46-48 at 1-25, p.49 at 1-10).

On cross-examination by Blake Mammuth, Esquire, the Child Advocate, Mother acknowledged she cannot have contact with her older Child, J.T., pursuant to a Protection from Abuse Order obtained by J.T.'s Father. Regarding her relationship with J.B., Mother stated there are no issues and does not believe J.B. voiced that he was scared of her and that she made him feel bad about himself. Regarding her positive tests for PCP at

32

CEU. Mother stated she has never used PCP and the positive tests were incorrect and were false positives. (N.T., 6/01/2021, p.50 at 6-25, p.51 at 1-25, p.52 at 1-12, p.53 at 1-25, p.54 at 19-25, p.55 at 1-25, p.56 at 1-7).

This Court heard credible, persuasive testimony from Mike Graves, Esquire, TPR, who testified he spoke to J.B., who is seven and one-half years old, and explained Adoption and his other options. It appeared to him that the Child understood what Adoption was and told him he was fine where he was now. J.B. told him he would like to be Adopted, however, he also stated that he did want to still have visitation with his parents, and his prior caretakers. (N.T., 6/01/2021, p.73 at 19-25, p.74 at 1).

**Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Child Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2).[3]**

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g).

---

[3] **42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1). Additional determinations.** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child.

33

Once Reunification is ruled out, the second preferred permanency option is Adoption. Adoption has been clearly established as the appropriate goal in the best interest of these Children. This Court heard credible, persuasive testimony from Ms. Jackson who testified that J.B. has an autism evaluation scheduled for June and is currently receiving weekly trauma therapy. H.W., has developmental services through Elwyn, and M.J., has Early Intervention Services and has an autism evaluation scheduled for June. She noted that Mother's comment to Dr. Russell regarding the Children not having any special needs or services was inaccurate. She opined it was in the best interest of these Children to be adopted because any other option, such as reunification, would not be in their best interest. She believes the Children would benefit from positive long-term parental relationships that Mother cannot provide. (N.T., 4/28/2021 at p.105 at 22-25, p.106 at 1-14).

This Court finds the record sustains the factual findings and legal conclusions regarding the Children's current placement, Mother's lack of compliance, and her negligible progress toward alleviating the circumstances of placement. Most importantly, the record demonstrates that reunification is not feasible, and that enough competent evidence exists to change the Permanency Goals of the Children from Reunification to Adoption.

## DUE PROCESS RIGHTS

Mother alleges this Court deprived her of due process rights and erred as a matter of law when it abruptly terminated Father's remote video testimony after Father had technical difficulties that impaired his ability to participate and provide testimony that would have supported Mother's case. This Court disagrees.

"Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996).

Mother's allegation that she was denied due process is a broad assertion that does not state the basis of her claim. This Court cannot speculate what Mother's allegations are where she only stated that Father's technical difficulties during his testimony somehow would have supported her case and changed the decision of this Court. Mother was never denied the opportunity to participate, testify, and present evidence on her behalf. She participated in the hearings on October 27, 2020, April 28, 2021 and June 1, 2021. Mother and Father testified on October 27, 2020 and June 1, 2021 and their attorneys were present at the hearings and presented evidence. Mother was not denied a fair and impartial hearing by this Court.

At the hearing on October 27, 2020 Father testified electronically and the Notes of Testimony stated, "Due to extremely poor audio from Mr. Jeanbaptiste's connection,

35

some of his words were inaudible and/or unintelligible." (N.T., 10/27/2020, p.38 at 14-22).

Father testified he had a job in New York, but is residing in Philadelphia at 1603 Colima Road, Philadelphia, PA 19115. He resides in a four-bedroom house with his Mother and his Sister. Regarding visitation with his Children, Father testified "they mess up and then tell you so (unintelligible) they sweep it under the rug. But when they're talking, of course they're talking about I don't visit my child. I've been going to the circus. Everything's fine. I'm just taking that ride for that circus show because of my son. I love my son. My kids." Father stated he does not miss visits with his son and always showed up for the visits. (N.T. 10/27/2020, p.39 at 6-25, pp. 40-41 at 1-25, p.42 at 1-6, p.43 at 24-25, p.44 at 1-6).

Father stated in March when COVID shut a lot of things down he participated in virtual visits, but stated the Foster Mom was the problem, that she was acting up and would not pick up the phone. He made a complaint to his caseworker about it. He also stated he spent a lot of money on his child and bought him a video game that he did not receive. (N.T. 10/27/2020, p.44 at 21-25, p.45 at 1-21).

Father testified he never endangered a child and never abused his Child. Father also testified he wants both of his Children reunified and living with him and noted that his Mother and family are there to support him when he is at work. Father stated he works as a caretaker at Jami Resident LLC at 3934 9th Street in Philadelphia, caring for mentally challenged people living by themselves but want to be independent. (N.T. 10/27/2020, p.42 at 8-17, p.46 at 17-25, pp.47-48 at 1-25, p.49 at 1-19).

36

On cross-examination by Ms. Mammuth, Esquire, Child Advocate, he stated he has contact with the Mother of his Children only when she acts normal. When Mother does not act normal and acts retarded, he blocks her. (N.T. 10/27/2020, p.51 at 14-25, p.52 at 1-5).

At the hearing on June 1, 2021, Father testified electronically before technical difficulties arose. Father testified the Children were not in his care when they were injured and that he did not know of the injuries until months later when J.B., came to his house. He testified that M.J., had not been born at that time and the arrangement he had with Mother was that he would get J.B., on the weekend and then drop him back with Mother. He stated he did not get along with Mother, so he blocked her, and they did not communicate and therefore did not see his son. Later they communicated again, and he began seeing his son. (N.T., 6/01/2021, p.65 at 8-25, p.66 at 1-22).

When technical problems occurred with the virtual transmission, Father continued to communicate sporadically, stating, "yeah, my mic is on." Thereafter this Court requested that Father call into the hearing by using his cell phone. This Court then requested Father's cell phone number from his attorney, Mr. Capaldi, who responded that he did not have Father's active cell number. This Court then questioned Mr. Capaldi as to when he talked to Father to prepare for the hearing, and he responded twice, "between this hearing and last hearing." Mr. Capaldi stated he could not recall when he last communicated with Father, and he did not have a current cell phone number for him. He noted he had two or three previous numbers for Father. Father then reconnected to the transmission and stated, " I am not driving, and I'm at work in a house." And again, technical difficulties prevented Father from communicating. Thereafter, Mr. Capaldi

stated, "I do not have anything else to present." (N.T., 6/01/2021, pp.67-71 at 1-25, p.72 at 1-10).

> This Court emphasized, " Mr. Baptiste has waived his right to present evidence because of his and his attorney's failure to secure a good line of communication and be in a position to present testimony to the Court just like everyone else on this call. I warn you all before when you have communication issues like this you've got to take the time, secure the presence of your client in some way, make sure your client is able to present testimony. You can't even give me a date when you last talked to him, Mr. Capaldi." (N.T., 6/01/2021, p.71 at 14-24, p.72 at 1-19).

## INADMISSABLE EVIDENCE:

Mother alleges this Court erred in holding that Mother's exhibits were inadmissible hearsay. This Court disagrees.

In *In re A.J.R.-H.*, 188 A.3d 1157, 1166-67 (Pa. 2018), the Pennsylvania Supreme Court restated that appellate court's review of a trial court's decision to admit or exclude evidence for an abuse of discretion. "An abuse of discretion exists where the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *In re Duran*, 769 A.2d 497, 506 (Pa.Super. 2001) (cleaned up)

During Mother's testimony, her attorney sought to admit into evidence several documents, none of which were self-identifying nor self-authenticating, and thus did not comply with Pa.R.E. Rule 902.[4]

---

[4] **PA ST REV Rule 902. Evidence That is Self-Authenticating.** The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted: **(1) Domestic Public Documents That Are Sealed and Signed.** A document that bears: (A) a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; the former Panama Canal Zone; the Trust Territory of the Pacific Islands; a political subdivision of any of these entities; or a department, agency, or officer of any entity named above; and (B) a signature purporting to be an execution or attestation. **(2) Domestic Public Documents That Are Not Sealed But Are Signed and Certified.** A document that bears no seal if: (A) it bears the signature of an officer or employee of an entity named in **Rule 902(1)(A)**; and (B) another public officer who has a seal and official duties within that same entity certifies under seal--or its equivalent--that the signer has the official capacity and that the signature is genuine. **(3) Foreign Public Documents.** A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester--or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may for good cause, either: (A) order that it be treated as presumptively authentic without final certification; or (B) allow it to be evidenced by an attested summary with or without final certification. **(4) Certified Copies of Public Records.** A copy of an official record--or a copy of a document that was recorded or filed in a public office as authorized by law- if the copy is certified as correct by: (A) the custodian or another person authorized to make the certification; or (B) a certificate that complies with **Rule 902(1), (2), or (3)**, a statute or a rule prescribed by the Supreme Court. A certificate required by paragraph (4)(B) may include a handwritten signature, a copy of a handwritten signature, a computer-generated signature, or a signature created, transmitted, received, or stored by electronic means, by the signer or by someone with the signer's authorization. A seal may, but need not, be raised. **(5) Official Publications.** A book, pamphlet, or other publication purporting to be issued by a public authority. **(6) Newspapers and Periodicals.** Material purporting to be a newspaper or periodical. **(7) Trade Inscriptions and the Like.** An inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control. **(8) Acknowledged Documents.** A document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments. **(9) Commercial Paper and Related Documents.** Commercial paper, a signature on it, and related documents, to the extent allowed by general commercial law. **(10) Presumptions Authorized by Statute.** A signature, document, or anything else that a statute declares to be presumptively or *prima facie* genuine or authentic. **(11) Certified Domestic Records of a Regularly Conducted Activity.** The original or a copy of a domestic record that meets the requirements of Rule

Exhibit M-1 was a Philadelphia Housing Authority (PHA) Waitlist Eligibility Interview Invitation, dated 4/09/2021. Mother testified she was in the process of obtaining housing through PHA and only needed an electricity bill for the screening process. This Court ruled it was not admitted because it was hearsay and not clearly established as a business record. (N.T., 6/01/2021, p.15 at 2-25, p.25 at 18-25, p.26 at 1-12). (Copy Attached as M-1).

M-3 was a copy of a letter from the Caring Together Program stating that Mother was enrolled in the program. Mother testified she was attending the Caring Together program and the Looking Forward program. She stated she receives drug and alcohol treatment since February 2021 and stated the letter was from the program director, who she identified as Charlene Irving, to show that she was enrolled. (N.T., 6/01/2021, p.20 at 19-25, p.21 at 1-25). (Copy not Attached, not found in the record).

---

803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. No. 76. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them. **(12) Certified Foreign Records of a Regularly Conducted Activity.** The original or a copy of a foreign record that meets the requirements of **Rule 902**(11), modified as follows: the certification rather than complying with a statute or Supreme Court rule, must be signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed. The proponent must also meet the notice requirements of **Rule 902**(11). **(13) Certified Records Generated by an Electronic Process or System.** A record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of **Rule 902**(11) or (12). The proponent must also meet the notice requirements of **Rule 902**(11). **(14) Certified Data Copied from an Electronic Device, Storage Medium, or File.** Data copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of **Rule 902**(11) or (12). The proponent also must meet the notice requirements of **Rule 902**(11). **(15) Certificate of Non-Existence of a Public Record.** A certificate that a document was not recorded or filed in a public office as authorized by law if certified by the custodian or another person authorized to make the certificate.

M-4 was a document from Greater Philadelphia Health Action (GPHA). Mother stated she was working with them since 2019 and stated the counselor's name was Rebecca but then stated it was Olga who provided the document stating that Mother continued treatment. (N.T., 6/01/2021, p.23 at 1-25, p.24 at 1-24) (Copy not Attached, not found in the record).

M-9 was four certificates from ARC. Mother testified she completed the Financial Education program, the Budgeting Workshop, Housing Assistance and Anger Management. (N.T., 6/01/2021, pp.31-32 at 1-25, p.33 at 1-6). (Copy Attached as M-9).

M-10 was a two-page document of Mother's drug test results from Parkway Clinical Laboratories. Mother testified she took a urine drug test in April 2021 at a laboratory which she chose. The test was positive for Oxycodone. (N.T., 6/01/2021, p.59 at 4-25, pp.60-61 at 1-25, p.62 at 1-6). (Copy Attached as M-10).

This Court found these documents presented by Mother were not admissible based on numerous objections that these documents were not self-identifying and self-authenticating. This Court reasoned, "Are there any documents that you can agree upon because obviously the issue here is that you're making hearsay references to the documents, or documents that contain hearsay information and I want to make it clear that evidence is not accepted by the Court as credible because it is hearsay. So, I wasn't quite sure where you were going with this. Are you going to go through this testimony and keep referencing—." "You have not established a foundation for using them to refresh her recollection. So, you're all over the place here. So, figure out where you want to go with this, how you want to use these documents, but don't refer to them unless you introduce them into evidence first, understood?" (N.T., 6/01/2021, p.24 at 15-24,

p.25, 1-13, p.26 at 1-12).

Further this Court reasoned, " well some of them are irrelevant. One I can't see the date, on the housing certificate, the January 14, 2020 certificate of completion, that's 2020. All right. These are photocopies of documents and I'm not able to admit them. They're not self-authenticating, and I have no great confidence in the authenticity of the documents otherwise, being photocopies. So, M-9 not admitted." (N.T., 6/01/2021, p.32 at 14-25, p.33 at 1-6).

These exhibits were not prepared by the testifying witness, Mother, and her counsel neglected to lay a foundation with regard to their preparation, and thus the exhibits were held to be inadmissible. In this case, Mother made some verbal attempts to convince the Court that she was in compliance. Her testimony alone will not support a finding that she was in compliance. Parties come to the Court and believe that it is the agency's responsibility to supply their evidence by way of documentary proof that they are engaged in various services, and in compliance. It's not the Department's responsibility to present evidence to show that they are in compliance. It is, and always has been, the parties' responsibility to present evidence, and this Court found no evidence whatsoever has been supported to document the so-called attempt by Mother to come into compliance. DHS presented clear and convincing evidence of Mother's failure to complete her objections, as well as testimony of its attempts to obtain information regarding her participation. Mother could have rebutted this testimony with proper documentation of her participation but did not do so.

## CONCLUSION

At the conclusion of the Hearing, the Court stated:

All right. The evidence in this case goes back for a substantial period of time beginning with the adjudication of these children, based upon the circumstances then. We'll start with J.B. Here the record is clear, convincing that the parents have done nothing to remedy the issues that brought this child into court. Neither parent is ready, willing and able to care for this child at this time.

There's a substantial credibility issue between what mother believes to be her case and what the reality is. And I give little weight to mother's testimony. The case worker that testified has an extremely comprehensive grasp on the facts and the history of this case, understands these children.

Mother lives in a kind of fantasy world where she believes that she can keep treating. Although she has no symptoms she continues to treat for drug and alcohol issue and mental health issues and she says, I don't have any drug issues or mental health issues. But I think the inference to be drawn from that is she does.

And I believe, based on her testimony and some of the irrational beliefs and the deceptive testimony by mother, indicates that she has no awareness of what it takes to raise a child. She believes that this child, as well as the other children, can just kind of hang around for a little while and maybe mom will be able to complete all of her objectives and begin to think about parenting a child.

The very fact that she wants to live in a home with a grandparent who was involved and responsible for the original injuries that brought this child into care suggests that she has no concept of reality. And it doesn't appear that she's going to be able to gain that context with any near—in any future period of time.

So, considering Josiah, the evidence under 2511(a) 1, 2, 5, and 8 is clear and convincing that the parents are not ready, willing and able to care for this child, that the child is in a

43

home. Because of the evidence suggesting any real parental relationship between the children, there would be no irreparable harm and it would be in the best interest of this child to be adopted. Therefore, mother's rights are terminated. Father, G.J.'s rights are terminated.

Moving on to the next child, H.W., the testimony was clear at the last listing that father was not ready, willing and able to care for the child, and there was no parental relationship, and there would be no irreparable harm. Rights were terminated. The Court makes the same findings with respect to mother, A.B., as it did in the case. The evidence is clear and convincing satisfying the requirements under the Act, Sections 2511(a) 1, 2, 5, and 8, and 2511(b). Mother's rights are terminated as to H.W., and father's rights—M.W.'s rights are terminated as to H.W. and the goal is changed to adoption.

Moving on the last child, M.J. Mother's rights are terminated. The Court incorporates the findings under the prior two cases, Sections 2511(a) 1, 2, 5, and 8, and 2511(b) are satisfied by clear and convincing evidence.

And regarding M.J., his rights are terminated similarly incorporating the finding under J.B.'s case. His rights are terminated under 2511(a) 1, 2, 5, and 8. Both the evidence in both cases satisfy the Act under 2511(b).

So accordingly, the Court finds that no one else has stepped up and identified themselves as a parent, but since the father's names were not on the birth certificates the Court is required to dispose of the open petitions filed by the Department, terminating all putative and unknown rights. This is done as an administrative issue to clear the way so that the matter can be moved to adoption. (N.T., 06/01/2021, p.74 at 22-25, pp.75-76 at 1-25, p.77 at 1-17, p.78 at 1-6).

For the foregoing reasons, this Court respectfully requests that the Decrees of Involuntary Termination of Parental Rights of Mother, A.B. and the Goal Changes to Adoption issued by this Court on June 1, 2021, be **AFFIRMED**.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

_____July 27th, 2021_____
**DATE**

45

## CERTIFCATE OF SERVICE

____ I hereby certify that a true and correct copy of the foregoing OPINION dated _July 27th 2021_ has been served upon the following parties by the manner as designated:

**Family Court Electronic Transmission**

Virginia Hinrichs McMichael, Esq.
150 N. Radnor Chester Rd, Ste F 200
Radnor, Pa. 19087
Counsel for Appellant Mother, A.B.

John J. Capaldi, Esq.
126 Fox Hollow Dr.
Sweetwater Farms
Langhorne, Pa 19053
Counsel for Father, G. J.

Jeffrey Bruch, Esq.
1515 Market St, Ste 1200
Phila., Pa 19102
Counsel for Father, M.W.

Robert Aversa, Esq., ACS
Kathleen B. Kim, Esq., ACS
Meagan C. Fitzpatrick, Esq., ACS
City of Phila Law Dept
1515 Arch St- 16th flr
Phila Pa 19102
City Solicitors- for DHS

Blake H. Mammuth, Esq.
Defenders Assoc of Phila
1441 Sansom St.
Phila PA 19102
GAL for Children

Michael Graves, Esq.
1700 Market St, Ste 1005
Phila PA 19103
TPR for Children

**ALLAN L. TERESHKO, Sr. J.**

_July 27, 2021_
**DATE**